IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

PAMELA FIKE                       *
                                  *
         v.                       *     Civil Case No. CCB-13-1539
                                  *
COMMISSIONER, SOCIAL SECURITY     *
                                  *
                        *************

REPORT AND RECOMMENDATIONS

Pursuant to Standing Order 2014-01, the above-referenced case was referred to me to review the parties' cross-motions for summary judgment and to make recommendations pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 301.5(b)(ix). I have considered the parties' motions. ECF Nos. 14, 18. This Court must uphold the Commissioner's decision if it is supported by substantial evidence and if proper legal standards were employed. 42 U.S.C. § 405(g); *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996); *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). I find that no hearing is necessary. Local R. 105.6 (D. Md. 2011). For the reasons set forth below, I recommend that the Commissioner's motion be granted and the Plaintiff's motion be denied.

Ms. Fike applied for Supplemental Security Income ("SSI") on March 28, 2010, alleging a disability onset date of May 1, 2010. (Tr. 130-34). Her claim was denied initially on July 30, 2010, and on reconsideration on December 23, 2010. (Tr. 66-69, 73-74). An Administrative Law Judge ("ALJ") held a hearing on January 13, 2012, (Tr. 31-63), and subsequently denied benefits to Ms. Fike in a written opinion. (Tr. 14-25). The Appeals Council declined review, (Tr. 1-6), making the ALJ's decision the final, reviewable decision of the agency.

The ALJ found that Ms. Fike suffered from the severe impairments of osteoarthritis/degenerative joint disease, mental retardation/borderline intellectual functioning,

depression, and anxiety. (Tr. 16). Despite these impairments, the ALJ determined that Ms. Fike retained the residual functional capacity ("RFC") to:

> perform light work as defined in 20 CFR 416.967(b) except the claimant requires a sit/stand option, allowing her to alternate between a sitting and standing position at least every thirty minutes; she is unable to push, pull or use foot control operations with the left lower extremity; the claimant can tolerate the occasional use of ramps and climbing stairs, but can never climbing [sic] ladders, ropes, or scaffolds; the claimant can tolerate occasional balancing, stooping, kneeling, crouching, and crawling; the claimant must avoid hazards, including moving machinery and unprotected heights; the claimant is limited to simple, routine, and repetitive tasks; she requires a low stress job, defined as having only occasional decision making and occasional changes in the work setting; and the claimant can have only occasional direct interaction with the public.

(Tr. 18). After considering the testimony from a vocational expert ("VE"), the ALJ determined that Ms. Fike was capable of performing jobs that exist in significant numbers in the national economy, and that she was not therefore disabled. (Tr. 24-25).

Ms. Fike raises three primary arguments on appeal. First, she disagrees with the ALJ's RFC assessment. As part of that argument, Ms. Fike contends that the ALJ failed to rely upon medical evidence to support the finding that she can perform light work with a sit/stand option. She also argues that the mental limitations in the RFC assessment are inadequate. Second, Ms. Fike argues that the ALJ failed to assign proper weight to the opinions of four treating physicians. Finally, Ms. Fike asserts that the ALJ erroneously concluded that she did not meet Listing 12.05(B) or 12.05(C). Each argument lacks merit and is addressed sequentially.

Ms. Fike first challenges both the physical and mental restrictions of the RFC assessment. Pl.'s Mot. 26-28. Ms. Fike contends that the RFC assessment fails to specify how long she can sit or stand and how much she can lift and carry occasionally and frequently. Pl.'s Mot. 26. She also argues that no medical source recommended a sit/stand option, and that the evidence of record contradicts such a limitation, as two of her treating physicians concluded that she could

2

not sit for six hours total in an eight-hour work day, or stand for two hours in an eight-hour work day. *Id.* Ms. Fike is correct that no medical source has provided an opinion that she have the option to alternate between sitting and standing every 30 minutes during an eight-hour work day. However, the ALJ's decision to include a sit/stand option in the RFC assessment is nevertheless supported by substantial evidence. "The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." SSR 96-8p, 1996 WL 374184, at *3. Relevant evidence includes evidence such as medical history, lay evidence, medical source statements, and medical signs and laboratory findings. *Id.* at *5. The ALJ considered an array of evidence in determining Ms. Fike's exertional capacity to alternate between sitting and standing. The ALJ noted that Ms. Fike's physical examinations had been within normal limits, that she had not been assessed with any significant limitations in her mobility, and that she had only received mild, conservative treatment for her back and knee conditions. *See* (Tr. 21, 301-03, 307). It seems that, in including the sit/stand option, the ALJ credited Ms. Fike's own testimony that she alternates between sitting and walking at the mall, and that she finds it difficult to sit through a 30-minute to one hour television program because of her problems with concentration, not because of a physical inability to sit. (Tr. 44-45). In fact, those findings are echoed by the report from treating physician Dr. McCoy, which suggests that Ms. Fike's ability to sit is limited only by anxiety, and that she has to stop standing for periods because of back spasms. (Tr. 334).

Moreover, a sit/stand option that allows Ms. Fike to alternate positions every 30 minutes is not at odds with "light work" as it is defined in agency regulations. Light work is defined as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 416.967(b). "Even though the weight lifted may be very little, a job

is in this category when it requires a good deal of walking or standing, when it involves sitting most of the time with some pushing and pulling of arm or leg controls." *Id.* A Physical RFC Assessment, dated July 30, 2010, to which the ALJ assigned "great weight," concluded that Ms. Fike could perform the demands of light work. (Tr. 289-96). The VE also testified that there would be several jobs available for an individual restricted to light work, who needed the option to alternate between sitting and standing every 30 minutes. *See* (Tr. 58-60) (noting that the hypothetical claimant could perform the positions of packer, machine feeder, and mail room clerk). Accordingly, I find that the physical restrictions in the ALJ's RFC assessment are supported by substantial evidence.

The mental component of the RFC assessment is likewise supported by substantial evidence. Ms. Fike argues that the ALJ erred by failing to address Ms. Fike's purported inability to understand, carry out, and remember instructions, and to respond appropriately to coworkers or supervisors. Pl.'s Mot. 27-28. However, the ALJ limited Ms. Fike to "simple, routine, and repetitive tasks." (Tr. 18). The ALJ also limited Ms. Fike to "low stress" jobs with only occasional decision-making, occasional changes in work setting, and occasional direct interaction with the public. *Id.* These restrictions directly address Ms. Fike's mental limitations in spite of the little medical evidence supporting them. In fact, the ALJ clearly stated that the opinions of examining and treating sources were "simply not supported by the treatment records." (Tr. 20). The ALJ described the evidence demonstrating Ms. Fike's conservative mental treatment and improvement in symptoms, yet gave Ms. Fike the benefit of the doubt by including several mental restrictions in the RFC assessment. (Tr. 20-21). Ms. Fike points to SSR 85-15 to argue that a claimant with a mental impairment may be unable to meet the demands of even "low stress" work. SSR 83-15, 1985 WL 56857, at *6. However, as discussed

fully below, the ALJ assigned little weight to the opinions of record that found severe mental limitations. The ALJ assigned "partial weight" to the opinion of Dr. Edward Ansel, an examining physician, who concluded that Ms. Fike was mildly-to-moderately mentally retarded. (Tr. 22). The ALJ did not fully credit Dr. Ansel's finding that Ms. Fike's panic disorder and agoraphobia resulted in "no useful ability to handle job-related stress." (Tr. 22). The ALJ found that Dr. Ansel's opinion was contradictory to the evidence of record, which showed that Ms. Fike leaves her home to shop and to smoke, and that Ms. Fike was promoted in school and has retained jobs in the past. (Tr. 22). The evidence of record supports the mental restrictions of the ALJ's RFC assessment, and remand is not warranted.

Next, Ms. Fike argues that the ALJ improperly disregarded the opinions of four treating physicians—Dr. McCoy, Dr. Davis, Dr. Hunt, and Dr. Nayeem. Pl.'s Mot. 28-32. I find that the ALJ's assignment of "little weight" to each physician's opinion was supported by substantial evidence. (Tr. 21-23). The ALJ must generally give more weight to a treating source's opinion. *See* 20 C.F.R. § 416.927(c)(2). However, where a treating source's opinion is not supported by clinical evidence or is inconsistent with other substantial evidence, it should be accorded significantly less weight. *Craig,* 76 F.3d at 590. The ALJ is not required to give controlling weight to a treating source's opinion on the ultimate issue of disability. SSR 96–5p, 1996 WL 374193, at *5. If the ALJ does not give a treating source's opinion controlling weight, the ALJ will assign weight after applying several factors, such as, the length and nature of the treatment relationship, the degree to which the opinion is supported by the record as a whole, and any other factors that support or contradict the opinion. 20 C.F.R. § 416.927(c)(1)-(6). Pursuant to Social Security regulations, the ALJ is required to "give good reasons" for the weight assigned to a treating source's opinion. 20 C.F.R. §416.927(c)(2).

5

The ALJ reasoned that Dr. J. McCoy's opinions were entitled to "little weight" because they were contrary to treatment records and unsupported by medical evidence. (Tr. 22). In a November, 2010 Medical Assessment Report, Dr. McCoy diagnosed Ms. Fike with the physical ailments of chronic lower back pain and knee pain. (Tr. 309). Dr. McCoy opined that Ms. Fike could not sit or stand for long periods of time, nor could she sustain competitive employment. (Tr. 310). The ALJ noted that these severe findings were at odds with the conservative course of treatment that Dr. McCoy provided. (Tr. 22). Dr. McCoy's treatment records indicate that despite Ms. Fike's complaint of "incomplete relief with flexeril and motrin," Dr. McCoy continued with that narrow course of treatment. *See* (Tr. 301-03). While Dr. McCoy did not rule out the possibility of more aggressive treatment in the future, he noted that her insurance first needed to be expanded to allow specialty care. (Tr. 302). The ALJ also noted that in the November, 2010 report, Dr. McCoy stated that Ms. Fike's credibility was "unknown," and that Ms. Fike needed to see an orthopedic doctor to get X-rays and an MRI before he could fully evaluate her complaints of back and knee pain. (Tr. 22) (citing Tr. 334).

The ALJ also assigned little weight to two opinions from October, 2011 in which Dr. McCoy opined that Ms. Fike was unable to perform any work activity, and that she satisfied the criteria of Listing 1.02A. (Tr. 22). As noted above, Dr. McCoy's conclusion that Ms. Fike's lower back and knee pain precluded work activity does not comport with the conservative treatment he provided. The results of Ms. Fike's physical exams were also largely positive. She had good range of motion of the extremities and spine, with some tenderness in the thoracolumbar muscles. *See* (Tr. 301-03) (noting good range of motion of knee and spine, crepitus of left knee on range of motion); (Tr. 307) (noting good range of motion and mild crepitus of knee). Moreover, several of Ms. Fike's visits with Dr. McCoy were unrelated to her

6

back and knee pain. *See* (Tr. 304) (stating hearing trouble as chief complaint); (Tr. 305) (stating bilateral ear pain and swelling as chief complaint); (Tr. 306) (stating sore thumb as chief complaint).

There is similarly no evidence to support a finding that Listing 1.02A is satisfied. Listing 1.02 requires the claimant to show major dysfunction of a joint characterized by several criteria, including, "gross anatomical deformity," "chronic joint pain and stiffness," and "joint space narrowing, bony destruction, or ankylosis of the affected joint(s)." 20 C.F.R. Part 404, Subpart P, App. 1, § 1.02. Subpart A pertains to involvement of one major peripheral weight-bearing joint, such as the hip, knee, or ankle, which "result[s] in inability to ambulate effectively." *Id.* An inability to ambulate effectively is defined as "an extreme limitation of the ability to walk." 20 C.F.R. Part 404, Subpart P, App. 1, § 1.00(B)(2)(b). Examples of ineffective ambulation include the inability to walk without the use of a walker, the use of two crutches or two canes, or the inability to carry out routine ambulatory activities, such as shopping and banking. *Id.* There is evidence in Ms. Fike's record demonstrating chronic pain of her left knee. *See* (Tr. 301-02, 307-09, 333-34, 421, 423-26). I can find no evidence, however, of joint space narrowing, *see* (Tr. 402) (MRI of left knee showing no joint space narrowing, bony destruction, or ankylosis), or an inability to ambulate effectively. Ms. Fike did not use a walker, or two canes, and there is no evidence that she cannot carry out routine ambulatory activities, such as shopping. *See* (Tr. 178-85, 204, 207) (Adult Function Report noting that Ms. Fike goes to the grocery store); (Tr. 191-92) (Third Party Adult Function Report noting that Ms. Fike goes grocery shopping and to doctor's appointments). Substantial evidence therefore supports the ALJ's assignment of weight.

The ALJ also assigned little weight to the opinions of Dr. Randy Davis, Ms. Fike's treating orthopedic surgeon. (Tr. 22). The ALJ cited Dr. Davis's brief treatment relationship

7

with Ms. Fike and a lack of evidentiary support as reasons for discounting his opinions. Dr. Davis concluded in a September 22, 2011 Medical Assessment Report that Ms. Fike could not sit for six hours in an eight-hour day, or stand for two hours in an eight-hour day. (Tr. 410). Dr. Davis also indicated that her symptoms would cause her to be absent at least 30 days out of a work year. *Id.* As the ALJ noted, Dr. Davis indicated that he first examined Ms. Fike on May 19, 2011, only four months before opining on her ability to work. *See* (Tr. 409). An ALJ may properly consider the length of a treatment relationship and the frequency of examination in assigning weight to a treating physician's opinion. 20 C.F.R. § 416.927(c)(2)(i). Moreover, as discussed above, the medical evidence of record is contrary to a finding of disabling back and knee pain. Dr. Davis also opined that Ms. Fike meets the criteria of Listing 1.02A. (Tr. 412). However, the ALJ correctly concluded that "there is no evidence that the claimant's knee disorder meets listing 1.02A." (Tr. 22).

Ms. Fike relies on SSR 96-5p to argue that the ALJ erred by failing to contact Dr. McCoy and Dr. Davis for clarification of their RFC assessments before assigning their opinions less than controlling weight. Pl.'s Mot. 30. SSR 96-5p explains how the agency evaluates medical source opinions on issues that the Commissioner has the sole authority to decide. These issues include the assessment of a claimant's RFC, whether a claimant's RFC prevents him or her from doing past relevant work, and whether a claimant is disabled. *See* SSR 96-5p, 1996 WL 374183, at *2; 20 C.F.R. § 416.927(d). SSR 96-5p states that, "if the evidence does not support a treating source's opinion on any issue reserved to the Commissioner and the adjudicator cannot ascertain the basis of the opinion from the case record, the adjudicator must make 'every reasonable effort' to recontact the source for clarification of the reasons for the opinion." SSR 96-5p, at *6. The ALJ in this case concluded that the medical evidence of record did not support the opinions of

8

Dr. McCoy and Dr. Davis. However, it does not appear that the ALJ had any difficulty ascertaining the bases of the opinions from the record, as the ALJ noted no ambiguities or confusion regarding the content of the opinions. *See* (Tr. 22). Rather, the ALJ concluded, in part, that the conclusions reached by Dr. McCoy and Dr. Davis were unsupported by the objective medical evidence. This, by itself, does not trigger the ALJ's duty to contact Dr. McCoy or Dr. Davis.[1] *See Jackson v. Barnhart*, 368 F. Supp. 2d 504, 509 (D.S.C. 2005) (upholding decision of magistrate judge who concluded that the ALJ's duty to contact a claimant's treating physician was not triggered merely because the physician's conclusion regarding disability was inconsistent with other medical evidence); *Allen v. Astrue*, No. 1:11-00609, 2013 WL 1309850, at *6 (S.D.W. Va. Feb. 28, 2013) (finding no duty to re-contact claimant's treating physician where the ALJ concluded that the treating physician's opinion was unsubstantiated by the record).

Ms. Fike next argues that the ALJ should not have discounted the opinions of Dr. Carl Hunt and Dr. Juhi Nayeem, her treating psychiatrists. Pl.'s Mot. 31-32. Ms. Fike contends that both Dr. Hunt and Dr. Nayeem found that her mental impairments satisfy the criteria of Listing 12.04. Pl.'s Mot. 31. Dr. Hunt diagnosed Ms. Fike with panic disorder and bipolar disorder. He also concluded that she had severe functional limitations. *See* (Tr. 330). Dr. Nayeem similarly concluded that Ms. Fike's mental impairments were severe. He commented that she "can't concentrate," is "easily frustrated," and had multiple inpatient treatments. (Tr. 417). The ALJ

---

[1] I also note that the social security regulations, which required the ALJ to re-contact medical sources when the evidence from a claimant's treating physician or other medical source was inadequate to determine whether the claimant was disabled, were deleted effective March 26, 2012. *See* How We Collect and Consider Evidence of Disability, 77 Fed. Reg. 10,651-01, *10655 (Feb. 23, 2012); *see also* 20 C.F.R. §§ 404.1512(e); 416.912(e) (2012) (amended). Although the regulations were in effect during the ALJ's consideration of this case, as noted above, the circumstances did not trigger the duty to re-contact the doctors.

9

accorded little weight to these opinions for several reasons. The ALJ concluded that Dr. Hunt's opinions were inconsistent with the mild, conservative treatment provided, that Ms. Fike lacked psychotic symptoms, and that her condition improved with medication. (Tr. 23). The ALJ also accorded Dr. Nayeem's opinion little weight because the medical evidence of record failed to show multiple inpatient treatments since Ms. Fike's alleged onset date. *Id.*

I find that the ALJ relied on substantial evidence in according the opinions little weight. As the ALJ noted, Dr. Hunt provided mild, conservative treatment consisting of medication management. *See* (Tr. 222, 235-38, 343-46, 348-50). Some of Ms. Fike's symptoms also improved throughout treatment. *See* (Tr. 222, 347) (treatment records noting "no problem with medication" and "medication is working for the panic disorder, but not for mood swings."). Ms. Hunt did not exhibit any signs of psychosis, and had coherent thought processes with no suicidal intent. *See* (Tr. 347-49). The ALJ was also correct to note that Dr. Nayeem's conclusion that Ms. Fike had multiple in-patient treatments is unsupported by the medical evidence of record. Furthermore, it appears that Dr. Nayeem's treatment of Ms. Fike's condition was also conservatively focused on medication management. *See* (Tr. 407-08).

Ms. Fike argues that, pursuant to SSR 96-8p and SSR 96-9p, a physician's progress notes "are not supposed to reflect the level of severity enumerated in their assessment of RFC." Pl.'s Mot. 32. She contends that in the absence of consultative examinations or mental RFC assessments which contradict a treating physician's opinion, the ALJ must accept a treating physician's opinion. *Id.* I disagree. First, social security regulations clearly provide that an ALJ is not required to accept a treating physician's opinion as controlling. *See* 20 C.F.R. § 416.927(c)(2). The ALJ may consider factors such as the relevant evidence provided to support a medical opinion and the medical opinion's consistency with the record as a whole. 20 C.F.R. §

416.927(c)(3)-(c)(6). Second, common sense dictates that a treating physician's RFC assessment will reflect the sum-total of the physician's observations over the course of the treatment relationship. However, it does not follow that a treating physician's progress notes will necessarily be inconsistent with the actual RFC assessment. As the ALJ noted, Dr. Hunt and Dr. Nayeem provided opinions that were not reflective of conservative treatment, and their treatment notes did not indicate severe mental limitations.

In finding that the ALJ's treatment of the opinions of Dr. Hunt and Dr. Nayeem was supported by substantial evidence, I also find that the ALJ did not err by concluding that Ms. Fike did not satisfy the criteria of Listing 12.04. *See* (Tr. 16) (finding that Ms. Fike's mental impairments did not meet or medically equal the criteria of Listings 12.04, 12.05, or 12.06). Listing 12.04 pertains to affective disorders, "characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome." 20 C.F.R. Pt. 404, Subpt. P, App. 1. § 12.04. In order to satisfy Listing 12.04, the claimant must meet the criteria identified in both "paragraph A" and "paragraph B" or, the criteria in "paragraph C." The ALJ concluded that Ms. Fike failed to meet the "paragraph B" and "paragraph C" criteria of Listing 12.04. *See* (Tr. 17). The "paragraph B" criteria require the claimant's mental impairment to result in at least two of the following: "marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration." 20 C.F.R. Pt. 404, Subpt. P, App. 1. § 12.04.

Here, testimony and evidence demonstrate that Ms. Fike had no marked restrictions in any of the aforementioned functional areas and no episodes of decompensation. In activities of daily living, the ALJ highlighted that Ms. Fike goes shopping, takes care of her own personal

11

grooming and hygiene, prepares meals for herself, and goes outside during the day to smoke cigarettes. *See* (Tr. 17) (citing Tr. 178-85). In social functioning and maintaining concentration, persistence, or pace, the ALJ concluded that Ms. Fike has "moderate difficulties." (Tr. 17). The ALJ noted that Ms. Fike lives with a boyfriend and a housemate, feels anxious around others, and tends to isolate herself. (Tr. 17) (citing Tr. 39, 50, 53). The ALJ also noted that Ms. Fike watches television and is able to drive. (Tr. 17, 178, 181). Despite finding that Ms. Fike failed to meet the "paragraph B" criteria, the ALJ nevertheless crafted the RFC assessment to account for her alleged difficulties in social functioning and concentration, persistence, or pace. (Tr. 17).

The record also supports the ALJ's conclusion that Ms. Fike failed to meet the criteria of "paragraph C," which require a showing of "a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medical or psychosocial support." 20 C.F.R. Pt. 404, Subpt. P, App. 1. § 12.04. The claimant must also show one of the following: (1) repeated episodes of decompensation, each of extended duration; (2) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or (3) current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement." *Id.* There is no evidence in the record of repeated episodes of decompensation. Furthermore, the medical evidence discussed above, which demonstrates Ms. Fike's conservative mental health treatment and her ability to act independently in many areas, precludes a finding that the "paragraph C" criteria are satisfied.

Finally, Ms. Fike argues that the ALJ should have found that her mental impairments satisfy sub-section B or C of Listing 12.05. Pl.'s Mot. 33-34. Listing 12.05 governs intellectual

12

disability, which refers to "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05. Listing 12.05 is met when the claimant shows "deficits in adaptive functioning" manifested during the developmental period, in addition to the requirements of sub-sections A, B, C, or D. *Id.* At issue here are sub-sections B and C. Sub-section B requires a valid verbal, performance, or full scale IQ of 59 or less. *Id.* Sub-section C requires a showing of two distinct prongs. First, the claimant must demonstrate "[a] valid verbal, performance, or full scale IQ of 60 through 70." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05. Second, the claimant must have "a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Id.* Ms. Fike attained a full scale IQ of 55, however, the ALJ rejected the score because he found no supporting evidence in the record for such a low IQ. *See* (Tr. 23). An ALJ "has the discretion to assess the validity of an IQ test result and is not required to accept it even if it is the only such result in the record." *Hancock v. Astrue*, 667 F.3d 470, 474 (4th Cir. 2012). As reasons for rejecting a score, an ALJ can rely on the inconsistencies between the IQ result and the claimant's actual functioning. *Id.*

The ALJ did just that in this case. The ALJ reasoned that Ms. Fike has successfully worked jobs in the past, and that she was never enrolled in any special education classes. (Tr. 18); *see also* (Tr. 324-27) (Ms. Fike's academic records indicating poor grades, but no special education classes). The ALJ also parsed through Ms. Fike's IQ results and noted that the grade equivalents for word reading, sentence comprehension, spelling, and math computation were inconsistent with a low level of functioning. (Tr. 18). Even if this Court were to find that the ALJ's rejection of Ms. Fike's IQ score did not rest on substantial evidence, remand would be

inappropriate because Ms. Fike also fails to demonstrate the deficits in adaptive functioning required by the introductory paragraph of Listing 12.05. Deficits in adaptive functioning can include limitations in areas such as communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." *Jackson v. Astrue*, 467 F. App'x 214, 218 (4th Cir. 2012). As has already been established, Ms. Fike has few deficits in adaptive functioning, as she drives a vehicle, goes shopping, prepares meals, and watches television for leisure. Accordingly, Ms. Fike does not meet the criteria of Listing 12.05.

CONCLUSION

For the reasons set forth above, I respectfully recommend that:

1. the Court GRANT Defendant's Motion for Summary Judgment, (ECF No. 18); and

2. the Court DENY Plaintiff's Motion for Summary Judgment, (ECF No. 14), and
   CLOSE this case.

Any objections to this Report and Recommendations must be served and filed within fourteen (14) days, pursuant to Fed. R. Civ. P. 72(b) and Local Rule 301.5.b.

Dated: April 14, 2014 /s/
Stephanie A. Gallagher
United States Magistrate Judge